Gary G. Colbath
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
601 West Fifth Avenue, Suite 800
Anchorage, Alaska 99501
(907) 646-3400
(907) 646-3480 fax

Attorney for Defendant

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br>　vs.<br>JAY DEALTON UNGURUK LEAVITT,<br>　　　　　　Defendant. | Case No. 3:17-cr-00072-SLG<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |
|---|---|

## I.　INTRODUCTION

Defendant, Jay Dealton Unguruk Leavitt, by and through counsel Gary G. Colbath, Assistant Federal Defender, moves this Court for a sentence below the guideline range set forth in the Presentence Investigation Report (PSR). Leavitt files this sentence memorandum in support of his specific sentencing request which is for a sentence **15 years imprisonment**. For all of the reasons set forth below, a custody sentence of that length, followed by **lifetime** supervised release with the conditions set forth in the PSR would be a sentence "sufficient but no greater than necessary" to accomplish the goals of sentencing and punish Forbes for his conduct.

//

//

## II. FACTS

### A. Nature of the Offense

The relevant facts of this offense are set forth in the PSR. When considered in light of the "heartland" type possession and peer-to-peer distribution pornography offense, Leavitt's offense conduct here is familiar. Leavitt used mainstream internet programs like Google, and common social media applications like Twitter, to search for, obtain, and trade child pornography with others. Because of this "open" use of these mainstream providers, Leavitt's offense was easily discovered and promptly reported to law enforcement.

Leavitt's involvement with such material was limited to his personal viewing, collection and trading online with others. During the offense period he did not engage in any contact offenses, nor attempt to entice or otherwise arrange any prohibited contact with minors.

Of great significance in this case was Leavitt's response to law enforcement's intervention in his conduct. When contacted by law enforcement and questioned about his on line activities, Leavitt immediately admitted his behavior and offense conduct. He then sought to cooperate with agents and help them with their investigation into others dealing in child pornography. Given the anonymous nature of the internet, Leavitt did not know the actual names or locations of any of the people from whom he obtained pornography or with whom he traded images. However, he did have within his phone and social media accounts, the contact information for such individuals. Moreover, as he

had interacted with these people prior through use of his on line accounts, he was in a position to keep communicating with them and get likely responses from them.

At law enforcements request, Leavitt gave investigators his login credentials and passwords to utilize his accounts for investigative purposes. He also provided them access to any requested devices he had. By doing so, this allowed investigators to essentially pose as Leavitt (or his fictitious on line identities) and interact with various others dealing in child pornography. This assistance by Leavitt was done with the advice of counsel and without any promise of leniency from authorities. However, Leavitt nevertheless cooperated as he knew it was the right thing to do and he genuinely wanted help for his on-going behavior.

Today, Leavitt remains the same remorseful man he was when law enforcement found him. He also remains someone who wants help for his sexual addiction and other mental health problems.

### B. Jay Leavitt's History & Characteristics

Jay Leavitt was born in Barrow, Alaska, to parents living in extreme poverty. Because of his biological parent's situation, Jay was adopted by his paternal Aunt and Uncle when he was an infant. Jay was sexually abused by a caregiver when he was eight or nine years old. He was first exposed to adult pornography at age 10. Although his parents did not suffer from any substance abuse issues nor subject Jay to any type of abuse, they divorced when he was 15 years old.

//

//

During his adolescence, Jay struggled to establish meaningful social relationships. He began using and abusing substances at age 17. He has undergone prior mental health evaluation which found that:

> He exhibited many of the thinking errors common in an untreated sex offender as well as attributes and behaviors in common with known sexual offenders. He was determined to be a potentially suitable candidate for sex offender treatment. The evaluation suggested Leavitt needed to address his sexual deviancy and preoccupation as well as his underlying sexual victimization. It was noted Leavitt had significant substance abuse issues (alcohol and drug) related to his offending and has personality issues that inhibit him socially but drive a need for excitement. According to the Static-2002R (an instrument designed to assist in the prediction of sexual and violent recidivism for sex offenders) conducted at the time of the evaluation Leavitt was in determined to be in the low-moderate risk category.

As he notes in his letter to the court, Jay knows he is in need of and really wants to receive treatment for his sex offending and other mental health conditions. He further recognizes the damage his substance use has caused and would like to get substance abuse treatment as well. Upon release from custody, he hopes to return to gainful employment and transition into a stable, sober living situation. He remains today a young man and there is no reason to believe that Jay will not return to his supportive family and be able to live a law abiding, healthy and productive life, if he can receive the treatment he needs.

//

//

United States v. Jay Dealton Unguruk Leavitt
Case No. 3:17-cr-00072-SLG                                                                Page 4 of 15

Case 3:17-cr-00072-SLG   Document 26   Filed 11/20/17   Page 4 of 15

### III. Argument & Authorities

#### A. Guideline Analysis

Leavitt's base offense level under the guidelines is 22. Based on that level, with his criminal History (Category III) and an adjustment for accepting responsibility, his recommended sentencing range under the guidelines would be 37 to 46 months. Given the heartland nature of his offense, the analysis should stop there. However, Leavitt's recommended guideline range, again after a reduction for timely acceptance of responsibility, is actually nearly *thirteen times higher* than that amount: 480 months. PSR ¶ 75.

This over 1000% increase in prison exposure is not the result of Leavitt being a leader in a criminal enterprise, having committed a new contact offense against a child or another, having obstructed justice during the investigation of the crime, or based out-of-the-ordinary nefarious conduct by him. Instead, the entire increase -- from a base offense level of 22 to an adjusted offense level of 43 -- is the result of the application of seven specific offense characteristics. PSR ¶ 26-32.

The fault in the guidelines here, lies not in the fact that these specific offense characteristics apply to Leavitt's case. The problem is that almost all of these "specific" offense characteristics apply to him and everyone else charged with receipt or distribution of child pornography. Decades ago these characteristics may have differentiated one case from another and provided sentencing courts with a rational basis to increase a particular defendant's sentence. Today, when smartphone, computer usage and internet access are ubiquitous, these characteristics are so generally applicable that they serve

to increase almost every defendant's sentence and provide little distinction between the most aggravated and mitigated cases.

The United States Sentencing Commission acknowledged this reality in its 2012 report, <u>Federal Child Pornography Offenses</u> (hereinafter 2012 Report). This voluminous report (468 pages) details the archaic nature and present inadequacy of the guidelines in providing meaningful distinctions among non-production (persons who didn't make the child pornography) offenders.

The existence of the report is, itself, noteworthy. Only three years prior to its publication, the Commission had released its report, History of the Child Pornography Guidelines. Notwithstanding the fact that it had just issued a major report on the guidelines as they applied to child pornography cases, the Commission identified five reasons for revisiting the topic and issuing another report.

The first basis for issuing the 2012 Report was that the Commission noted a substantial increase, both numerically and by percentage of total cases, of defendants being sentenced in federal court for child pornography offenses. 2012 Report, Executive Summary, p. ii. Thus, the issues raised here by Forbes are important not only as they pertain to his case, but also to the many other non-production child pornography cases that are being prosecuted federally.

The second basis identified by the Commission was the dramatic increase in sentences imposed in child pornography cases that were below the recommended advisory guideline range for those cases. The Commission noted that by 2011, in non-production cases, 62.8% of the defendants sentenced in federal court received sentences

below the recommended guideline range. *Id.* at ii-iii. This suggested to the Commission that "a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.*

The third factor cited by the Commission is the one most relevant to the arguments advanced by Leavitt. The Commission's assessment of the issue makes those arguments clear:

> [A]s a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability. Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the Internet. As a result, four of the of six sentencing enhancements in §2G2.2 - those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels - now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

This third factor describes the scenario that has led Leavitt's guideline range to increase over 1000% from the base offense level for conduct that is neither atypical nor shocking compared with other child pornography distribution cases. Leavitt's offense

level was increased a total of **25** levels for conduct that is almost all consistently common and present in distribution cases and can by no means be characterized as "specific" to Leavitt's crime. An example is the increase in offense level by 5 points for distribution. PSR ¶ 27. Using social media to trade images is the kind of conduct identified by the Commission as now being commonplace, whereas it was almost unheard of and very novel when the guidelines were written. 2012 Report, pp. ii-iii.

Another four points were added to Leavitt's offense level because of sadistic or masochistic conduct. PSR ¶28. Child pornography, by definition, involves sexualized depictions of children. In practice, it typically involves sexual acts that meet the very broad definition of sadistic or masochistic behavior. The Commission again noted that "typical child pornography images contained in federal offender collections depict prepubescent children engaging in explicit sexual conduct." 2012 Report, p. 84 & n. 74. In 2010, 75% of all defendants received increased offense levels for possessing sadistic or masochistic images. 2012 Report, p. 141.

The next "specific" offense characteristic used to increase Leavitt's is the most archaic of those included in §2G2.2 of the guidelines: "used an interactive computer." PSR ¶ 30. As the Commission pointed out in its 2012 Report, "Indeed, most of the enhancements in §2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail." Indeed, smartphones were not even invented when the guidelines were enacted. More than being outdated in a world where virtually all child pornography is disseminated by interactive computer means, it is hard to fathom why the use of a computer would increase a

particular defendant's sentence. Historically, child pornography was produced by way of limited issue media, such as Polaroid or conventional filming. This meant an ever present demand for new victims and a commercial incentive for producers to create new images as the rarity of the images resulted in high prices. In a case such as Leavitt's where the images were available to him and others free of charge through use of a simple Google search or peer to peer network, the commercial incentive to create new victims and create new images has largely disappeared. At a minimum it presents in a world far different and far more ordinary than that which existed when the guideline was enacted.

Yet another "specific" offense characteristic identified in Leavitt's PSR as a basis for increasing his guideline range was that he possessed more than 600 images. PSR ¶ 31. The image count enhancement was also specifically addressed by the Commission in the 2012 Report, which noted that, "in the Internet age, most offenders possess large volumes of images. As a result, the guidelines, which max out at 600 images or more, fail to differentiate among offenders." 2012 Report, pp. ii-iii. The Commission noted that in 2010, 96.9% of the defendants sentenced for child pornography received some increase in their offense level based on the number of images possessed, and **69.6%** received the maximum possible upward adjustment for possessing 600 or more images. 2102 Report, p. 141. This is particularly apparent when one considers that each video is counted as equaling, at minimum, 75 images. U.S.S.G. §2G2.2, Application Note 4(B)(ii). Thus, a person who possesses 9 less-than-a-minute videos is facing a maximum upward adjustment. That person is adjudged equally culpable under the guidelines as someone who possesses 9,000 or 90,000 images.

The fifth and final basis for the Commission revisiting the issue of child pornography guidelines in 2012 after its comprehensive historical review of the guidelines in 2009 was that:

[M]ost stakeholders in the federal criminal justice system consider the nonproduction child pornography sentencing scheme to be seriously outmoded. Those stakeholders, including sentencing courts, increasingly feel that they 'are left without a meaningful baseline from which they can apply sentencing principles' in non-production cases. 2012 Report, p. iii.

This dissatisfaction among stakeholders, people like this Court, led the Commission to question the guideline's continued relevancy. And since issuance of the 2012 Report, no substantial changes have been made in the guidelines. Because the guidelines, and particularly the application of "specific offense characteristics" within the guidelines, do not give the Court meaningful guidance as to a just sentence individually tailored to the facts of Jay Leavitt's case, he asks that the Court calculate, but then disregard the guideline range set forth in the PSR.

The use of the term "disregard" by Leavitt herein may seem inappropriate. It is common to typically talk about downward departures within the guidelines and variances from the guidelines, not the disregarding of them. However, the concepts of departures and variances from the guidelines are tethered to the notion that: the guidelines themselves somehow provide a meaningful baseline from which the analysis should begin. That is not true in child pornography cases. Moreover, case law since the

guidelines were determined to be merely advisory suggests that a sentencing court may disregard the guidelines in some cases:

> The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, USSG 5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless, see Rule 32(f). Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.

*Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted) (emphasis added). It follows from *Rita* that if sentencing courts may not presume the guidelines to be reasonable, that they may determine that the guidelines are unreasonable in some situations. Nothing in our federal sentencing scheme would require this Court to give due regard to an unreasonable, or, at minimum, unhelpful, sentencing model.

**B. <u>Sentence Sufficient But Not Greater than Necessary – 3553(a)</u>**

Because every sentence must be tailored to fit the individual defendant and individual offense, it only makes sense that certain sentences will call for different levels of punishment and different types of consequences despite being derived from the same root offense. That is the case here.

Jay Leavitt is a young, native, man with a history of being sexually abused and sexually offending himself in the past. He has a drug abuse problem. He has largely not

received intensive sex offender or mental health treatment. He faces a 15 year mandatory minimum sentence which is a terribly long time. The court has the ability to order that Leavitt follow strict conditions and be supervised for the rest of his life. He will register as a sex offender for the rest of his life. He did not commit a new contact offense nor attempt to entice a child. His most recent evaluation indicated that he presents a low risk of danger to the community and has a decent prognosis for rehabilitation. He is employable and has substantial family support.

Section 3553(a)(2)(A) requires "just punishment." The Supreme Court has noted that a sentence imposing a term of federal probation is punishment. See, *Gall v. United States*, 552 U.S. 38 (2007). Certainly a sentence of 15 years in prison followed by a lifetime of supervised release would qualify as such. But his punishment and consequences would not end there. As a convicted sex offender, he will be forced to register for life with law enforcement. This will further restrict where he can live and work for the rest of his life.

Section 3553(a)(2)(B) requires the court to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Empirical research from across the country shows no relationship between sentence length and deterrence; thus, deterrence provides no basis for a sentence of any length. There is simply no evidence that increases in sentence length reduce crime through deterrence. In one of the best studies of specific deterrence, which involved federal white collar offenders (presumably the most rational of potential offenders) in the pre-guideline era, no difference in deterrence was found even between probation and imprisonment. For his single prior

felony offense, Leavitt was only sentenced to serve 3 years in prison during which he was eligible for parole after serving less than 2 years. The current mandatory minimum sentence the court can give here is obviously exponentially longer than that period which is bound to have a strong deterrent effect on Leavitt and the public.

Section 3553(a)(2)(C) requires the court to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." This purpose of sentencing has to do with both the risk of recidivism and the nature of the defendant's prior crimes, if any. Leavitt will serve at least 15 years in prison during which he will be able to receive intensive sex offender and substance abuse treatment. Even if released at that point, he will then be subjected to lifelong registration requirements and active supervision of life, during which he will receive further offense specific treatment, be monitored, and be subject to all sorts of restrictions on his conduct in addition to being required to register at all times. This amount of prison time followed by lifetime supervision is more than sufficient to provide adequate community protection.

Section 3553(a)(2)(D) requires the court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." When considering this need, the court must be mindful of 18 U.S.C. § 3582 which indicates that "imprisonment is not an appropriate means of promoting correction and rehabilitation." Today, there is substantial evidence that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, leads to increased recidivism, and that community

treatment programs are more effective in reducing recidivism than prison treatment programs.

Given the Supreme Court's decision in *Gall*, the kinds of sentences available to the court are limited by only the statutory minimum and maximum. The court is otherwise free to determine any type of sentence combination within statutory bounds.

Leavitt's advisory guideline range is set forth in the PSR and discussed above. For the reasons stated herein, the guideline applicable to this case is hopelessly flawed and should simply be rejected by the court as unhelpful.

Next, a sentence as requested above would not create any unwarranted sentence disparity in this case. Each case is different and must be addressed based upon its individual circumstances. As cited above, the most recent sentencing statistics show that a majority of §2252A(a)(5) offenses across the entire country result in a below the guidelines sentence. That being the case, sentences are obviously being imposed by courts based upon analysis of the statutory factors and their particular application to the offense and offender before the court. As such, any sentence tailored to the specific offense conduct and defendant being sentenced under this statute would not be in disparity to the process and majority of resulting sentences throughout the nation at this point.

Finally, restitution has not been requested so that is not an issue in this case that supports a lengthy prison sentence or affects the court's decision here.

//

//

DATED this 20th day of November, 2017.

                Respectfully submitted,

                FEDERAL PUBLIC DEFENDER
                FOR THE DISTRICT OF ALASKA

                */s/ Gary G. Colbath*
                Gary G. Colbath
                Assistant Federal Defender
                (907) 646-3414
                gary_colbath@fd.org

Certificate of Service:

I certify that on November 20, 2017, a copy of the foregoing document, with attachments, was served electronically on:

Jonas M. Walker, Assistant U.S. Attorney

*/s/ Gary G. Colbath*

United States v. Jay Dealton Unguruk Leavitt
Case No. 3:17-cr-00072-SLG               Page 15 of 15

Case 3:17-cr-00072-SLG Document 26 Filed 11/20/17 Page 15 of 15